[Cite as *State v. Scheffield*, 2017-Ohio-2593.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# GEAUGA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | **:** | **O P I N I O N** |
| Plaintiff-Appellee, | **:** | |
| - vs - | **:** | **CASE NO. 2015-G-0053** |
| DORETTA SCHEFFIELD, | **:** | |
| Defendant-Appellant. | **:** | |

Criminal Appeal from the Geauga County Court of Common Pleas.
Case No. 15 C 000094.

Judgment: Affirmed.


*James R. Flaiz*, Geauga County Prosecutor, and *Nicholas A. Burling*, Assistant Prosecuting Attorney, Courthouse Annex, 231 Main Street, Suite 3A, Chardon, OH 44024 (For Plaintiff-Appellee).

*Thomas Rein*, 820 Superior Avenue, Suite 800, Cleveland, OH 44113 (For Defendant-Appellant).


TIMOTHY P. CANNON, J.

{¶1} Appellant, Doretta Scheffield, appeals from the judgment of conviction issued by the Geauga County Court of Common Pleas on November 12, 2015. Doretta was convicted of one count of aggravated murder, in violation of R.C. 2903.01(A), and one count of tampering with evidence, in violation of R.C. 2921.12(A). At issue on appeal are the sufficiency and manifest weight of the evidence; the prejudicial nature of the testimony of two witnesses presented by appellee, the state of Ohio; the alleged

ineffective assistance of trial counsel; and Doretta's Fifth Amendment protection against self-incrimination at her sentencing hearing. Based on the following analysis, we affirm the trial court's judgment of conviction.

{¶2} Randy Scheffield and his wife, Doretta, lived together on Ravenna Road in Newbury, Ohio, with two small dogs. Together they owned Scheffield Lawns, Inc., a landscape and snow plow business Randy had started on his own in the 1980s. Initially, the business was operated out of the home of his parents, Rebecca and Eugene Scheffield, in nearby Chagrin Falls, Ohio. Rebecca was in charge of the bookkeeping until Randy and Doretta married in 2002; at that time, Doretta took over the bookkeeping. The company continued to use Randy's parents' address as its official business address, however, and received all of its mail and payments there. Rebecca assisted Doretta by opening envelopes containing checks and listing them on deposit slips for the bank. Doretta's son, David "Tig" Rowles, also worked for the company as a laborer. Doretta's children—Tig and two daughters—are Randy's step-children. Randy does not have any biological children.

{¶3} Randy and Doretta awoke early on the morning of December 27, 2011, and Randy left the house to pick up breakfast. Between 7:00 and 7:30 a.m., Randy purchased cigarettes at a gas station, went through a McDonald's drive-thru, and returned home. The couple ate breakfast and watched the weather news, as it was shaping up to be the first day for snow plowing that season. At some point, Randy lay back down for a nap; Doretta took a shower and left the house between 9:00 and 9:30 a.m. in Randy's truck.

{¶4} Doretta first went to Randy's parents' home to pick up checks for a deposit. It is disputed how long she visited with Rebecca and Eugene, but when she

2

left there, Doretta stopped by a driveway in the area in response to a request for snow plowing. She then made two phone calls from her cell phone—one to the homeowners regarding the driveway and one to Gina Battaglia, Tig's girlfriend and the mother of Doretta's grandson.

{¶5} Doretta then made a deposit at Charter One Bank at approximately 10:43 a.m. At 10:47 a.m., Doretta called Randy's cell phone and left a voicemail message indicating where she had been that morning and that she was going to Wal-Mart for groceries and then to Gina's to get her hair cut and visit her grandson. She told Randy to call her back if he wanted anything from the store. At 11:04 a.m., Doretta called one of her daughters, Beth Ann Rowles-Major.

{¶6} While at Wal-Mart, Doretta again called Randy's cell phone and left a second voicemail message at 11:42 a.m. She repeated that she would be stopping at Gina's and told Randy what she was about to purchase at the store. Doretta checked out at Wal-Mart at 11:47 a.m. At 11:59 a.m., Doretta again called the homeowners regarding the snow plowing quote.

{¶7} At 12:08 p.m., Doretta left Randy a third voicemail message as she headed toward Gina's home. She reiterated her previous stops and again outlined her remaining agenda. Doretta said that if Randy had not yet eaten lunch, she would make him something when she got home.

{¶8} At approximately 1:30 p.m., Doretta received a phone call from Randy's friend, Ralph Dickerson, who plowed snow for the company in his part of the county. He inquired of Doretta about plowing that night; Doretta told Ralph that Randy was sick.

{¶9} At 1:59 p.m., Doretta left a final voicemail message for Randy. She stated she was at Gina's playing with her grandson, visiting with Gina's parents, and about to

3

get her hair cut. Doretta also said they would have the lasagna she just purchased at Wal-Mart for dinner that evening, but it would need to be thawed.

{¶10} At approximately 4:00 p.m., Doretta returned home. She put the groceries away and then went outside to a large detached garage. Although her son, Tig, did not live there, he regularly worked on snowmobiles and other engines in this garage on Randy and Doretta's property. Tig was in the garage working when Doretta arrived home.

{¶11} Shawn O'Neill had picked Tig up for breakfast that morning around 11:30 a.m., and the two of them had been working in the garage since approximately 1:00 p.m. Prior to Doretta's arrival at 4:00 p.m., Tig had gone inside the house once to use the restroom, at approximately 3:00 p.m., and brought one of the dogs out to the garage. Following Doretta's arrival at 4:00 p.m., Shawn went into the basement of the home, at approximately 5:00 p.m., to use the restroom. Other than changing a load of laundry in the basement at the same time Shawn went inside, Doretta remained in the garage with Tig and Shawn for the next approximately five to six hours.

{¶12} Doretta received a phone call from Gina at 5:09 p.m. and again at 7:24 p.m. Ralph also called at 5:45 p.m. to again inquire about snow plowing that night.

{¶13} Many other of Tig's friends were in and out of the garage that evening. Craig Schwartz was in and out twice picking up a lawnmower Tig had repaired for him. Allison Dean and Brad Davis stopped by on their way to a party. Jason Tibbs arrived at approximately 7:30 p.m. ready to plow snow. Gina was there with her and Tig's son from approximately 7:30 to 8:30 p.m. And Brandon O'Neill, Shawn's brother, arrived between 7:00 and 8:00 p.m. with a pizza. Brandon and Gina had been together prior to

4

their separate arrivals; they had visited one of Gina's friends together for approximately fifteen minutes.

{¶14} Around 9:30 p.m., Doretta indicated she was going inside to wake up Randy and fix him dinner. Doretta then found Randy unresponsive in their bed and came running out to the garage shouting that Randy would not wake up. Shawn grabbed a hold of Doretta in an attempt to calm her down. Brandon called 911. Tig and Jason ran inside, and Jason also called 911. Jason handed the phone to Tig, who was given instructions to attempt to revive Randy. Tig was crying and responded to the dispatcher that he was unable to move Randy; Tig said he had grease all over his hands and that Randy was cold, stiff, and too heavy to roll over. Tig stated he thought Randy must have had a heart attack or an aneurysm and that he was bleeding from his left ear. No one attempted to perform CPR on Randy.

{¶15} Responding emergency personnel pronounced Randy dead at the scene. A wound was discovered in the back of Randy's head from which he had been bleeding. Randy's body was removed by the coroner for an x-ray of his head, which revealed an object in the brain later identified as a .22 caliber bullet.

{¶16} The Geauga County Sheriff's Office responded to the scene and found Doretta on the ground in the garage; she was crying. Doretta had remained in the garage with Shawn from the time she left the house screaming until the police found her there. Doretta was taken to the sheriff's office that night for a recorded interview, but she was not in custody or a suspect at that time.

{¶17} Detectives found no evidence of forced entry into the home. The couple's other dog was found under Randy's bed. Randy's wallet was on the floor in the bedroom with its contents strewn about; no cash was present. A box for a Ruger .22

5

semiautomatic handgun was discovered in a dresser drawer, as well as .22 caliber ammunition in a separate dresser, but that particular gun was never located. Officers on the scene took photographs inside and outside the house, as did the Bureau of Criminal Investigation ("BCI"). Physical items were also collected from the scene for DNA analysis.

{¶18} The detectives interviewed and collected gunshot residue swabs from everyone then present; this included Doretta, Tig, Gina, Jason, Shawn, Carmen Tizzano (another of Tig's friends), Beth Ann Rowles-Majors (one of Doretta's daughters), and Carl Majors (Beth Ann's husband). Brandon had left after Randy was found and before the testing was performed; detectives therefore went to his house the next morning to interview Brandon and collect a gunshot residue swab.

{¶19} An autopsy was performed the next day. The cause of Randy's death was determined to be a gunshot wound to the head with skull and brain injuries. It was ruled a homicide.

{¶20} The Geauga County Sheriff's Office investigated the homicide of Randy Scheffield for over three years before three individuals were indicted: Doretta Scheffield; her son, David "Tig" Rowles; and his girlfriend, Gina Battaglia. On March 26, 2015, Doretta was indicted by the Geauga County Grand Jury on four counts: complicity to commit aggravated murder, complicity to commit murder, complicity to commit tampering with evidence, and complicity to commit theft. This indictment was assigned case No. 15C000060. On May 6, 2015, the State filed a superseding indictment charging Doretta with the following eight counts:

> Counts 1 & 2: complicity to commit aggravated murder, an unclassified felony, in violation of R.C. 2903.01 and 2923.03;

6

Counts 3 & 4: complicity to commit murder, an unclassified felony, in violation of R.C. 2903.02 and 2923.03;

Counts 5 & 6: complicity to commit tampering with evidence, a felony of the third degree, in violation of R.C. 2921.12 and 2923.03;

Counts 7 and 8: complicity to commit aggravated theft, a felony of the third degree, in violation of R.C. 2913.02 and 2923.03.

The two cases were ordered consolidated and were administered under case No. 15C000094. The charges allege Doretta aided and abetted and/or conspired with Tig and Gina to intentionally murder Randy with premeditation; to dispose of the firearm used to commit the murder; and to steal property, money, and assets, of some amount between $150,000 – $750,000, belonging to Scheffield Lawns, Randy, and his estate.

{¶21} On September 14, 2015, a hearing was held on the issue of whether there existed independent evidence of a conspiracy, pursuant to Evid.R. 104. The trial court found the State did not provide the quantum of evidence necessary to support a prima facie case of conspiracy. As a result, any out-of-court statements made by the alleged co-conspirators, Tig and Gina, were inadmissible hearsay, pursuant to Evid.R. 801(D)(2)(3), for the purposes of Doretta's trial. The trial court granted the State's motion to amend Counts 2, 4, 6, and 8 of the indictment by removing the language of complicity and leaving the underlying offenses, thereby charging Doretta as the principal offender.

{¶22} A jury trial commenced on September 16, 2015, and continued for the better part of two weeks.

**Prosecution's Case in Chief**

{¶23} Lieutenant Brandon Reed testified that he received the 911 call from Jason Tibbs. The 911 recording was played for the jury, which included Lt. Reed's attempt to instruct Tig how to perform CPR on Randy. Tig is heard explaining that he

7

cannot do so because his hands are greasy from working on the machines in the garage. Tig also told Lt. Reed that Randy could not be rolled over because he was stiff and weighed almost 300 pounds. Tig told Lt. Reed he thought Randy might have had an aneurysm because Randy was bleeding from his left ear. Lt. Reed kept Tig on the line until emergency personnel responded to the scene.

{¶24} Deputy Heather Bilicic testified that she was one of the first officers to arrive on the scene. She and Sergeant Jonovich were met by Tig and Jason outside, who escorted them to the bedroom upstairs. Deputy Bilicic stated Randy was not breathing, had no pulse, was cool and rigid to the touch, his skin was mottled, and he had an injury to the base of the skull from which he was bleeding. Deputy Bilicic testified that it appeared Randy's body was in post mortem lividity and rigor mortis, which indicates death had occurred sometime earlier.

{¶25} The deputy testified she looked around the room, and then at the inside and outside of the house, for any indication as to what could have caused Randy's injury. She found no signs of a struggle or forced entry, and no report was made of broken or stolen items. She saw a wallet on the floor in the bedroom with its contents strewn around, but no cash. She also found an empty Ruger box in the dresser drawer.

{¶26} Deputy Bilicic further testified that she never saw Doretta in the bedroom and found her in the garage on the floor; she was sobbing, hysterical, and her knees buckled when she was told that Randy was deceased. Jason and Tig had to help the deputy get Doretta off the floor and into the house. Doretta then told Deputy Bilicic that she last saw Randy at 9:00 that morning and volunteered her entire day's schedule. Doretta stated she came home at 4:00 p.m. and saw that the bedroom doors were shut from the hallway and from the bathroom, which meant Randy was sleeping, so she went

outside to Tig's garage. Doretta also told the deputy that she had last seen the Ruger the day before; Randy had taken it out to look at it and then left it on the breakfast bar under his baseball cap. Deputy Bilicic testified the gun was not on the breakfast bar that evening. Doretta told the deputy that Randy always had between $20-$200 cash in his wallet.

{¶27} The deputy stated two dogs were present: one appeared to be aggressive, but would not come out from Randy's bed; the other was running around and barking on the first floor. She also stated no crime scene tape was used, but the officers had secured the bedroom.

{¶28} City of Chardon Police Chief William Scott Niehus was a lieutenant with the Geauga County Sheriff's Office on December 27, 2011. He testified that he arrived at the scene around 2:00 a.m. on December 28, 2011, by which time a crime scene log had been set up. He directed interviews and gunshot residue tests of all civilians present at the scene when Randy was discovered, and he applied for a search warrant of the home. He further testified that he instructed Detective Juanita Vetter to conduct a recorded interview with Doretta at the sheriff's office. A video camera was set up on a tripod in the room, and he watched the interview on a monitor as it was being conducted. That interview was played for the jury.

{¶29} Detective Sergeant Aaron Graley testified he was called to the emergency room to investigate Randy's death, where the x-ray had revealed an object in Randy's skull. He then reported to the crime scene. A search warrant was obtained, and they collected bedding, the wallet and its contents, a bathroom hand towel with a suspicious stain, the drain trap from the bathroom sink, the Ruger pistol box, and ammunition. On December 29, 2011, Detective Graley returned to the scene and collected a Get-Go

9

receipt dated December 27, 2011, at 7:01 a.m., as well as a tin that contained a small straw, a razor blade, and an empty clear vial. The tin was found in the bedside dresser on the opposite side of the bed from where Randy was found.

{¶30} Detective Graley testified the house was secured by law enforcement for a couple of days, but crime scene tape was not used. He stated there were four entrances to the house, one of which was in the bedroom. The bedroom entrance was covered with clutter, which would had to have been moved to gain entrance from the outside. He testified the gunshot residue test performed on Doretta's hands was negative, as well as the tests performed on the steering wheel and seatbelt in Randy's truck.

{¶31} Finally, Detective Graley testified that Brenda Brown, who lived down the street from the Scheffields, reported seeing an unknown individual in a red plaid flannel shirt walking the neighborhood around 11:15 a.m. on December 27, 2011. The sheriff's office obtained a surveillance photo of a man matching this description ("the red shirt man") at a gas station approximately 600 yards away from the Scheffield residence at 9:17 a.m. on December 27, 2011. The man was never found or identified but was not considered a suspect.

{¶32} Detective Mitchell Kelly testified that he collected surveillance videos from the area in order to establish a timeline of December 27, 2011; some of these videos were played for the jury. Randy is seen at the Get-Go between 6:59 and 7:02 a.m. and at McDonald's between 7:06 and 7:07 a.m. His truck passes the BP station on his way home at 7:24 a.m. A truck similar to Randy's is then captured by the same camera at 9:29 a.m., 9:34 a.m., 11:09 a.m., and 12:09 p.m. Doretta is captured by the cameras at Wal-Mart, arriving at 11:21 a.m. and departing at 11:51 a.m.

{¶33} Detective Kelly also testified regarding the search for "the red shirt man." He stated the sheriff's office put together a flyer with surveillance photos. The only tip they received was from an anonymous source stating people who might have been involved with Randy's death were hiding in an abandoned house near the Sheffield residence. No evidence was found, however, that anyone had been staying at the abandoned house. Detective Kelly also testified that the murder weapon was never found.

{¶34} Shawn O'Neill testified that the Scheffields were like family to him. He said that on the morning of December 27, 2011, he picked up Tig for breakfast at around 11:30 a.m. The two of them arrived at Tig's garage on the Scheffield property around 12:45 p.m., and they worked on machines and snowmobiles with power tools and chemicals. Doretta arrived at approximately 4:00 p.m., came out to the garage to say hello, went inside to put the groceries away, and came back out fifteen minutes later. Around 5:00 p.m., Shawn went inside to use the restroom in the first floor basement; he uses a wheelchair so could not access the main second floor on his own. Doretta entered the basement to change a load of laundry as Shawn was heading back to the garage. Around 9:00 p.m., Doretta announced she was going inside to wake up Randy and fix dinner. Shawn testified that a few minutes later he heard Doretta yelling, and then she came crashing into the garage yelling that Randy would not wake up and there was blood. Shawn said Doretta was shaking and crying uncontrollably, so he grabbed her and pulled her onto his lap and held her. Tig ran inside with Jason and Brandon. Shawn testified that both Tig and Doretta had acted normal throughout the day, but he did not see Randy. He testified the dogs always bark at people, and he did

11

not hear the dogs barking that day. He also stated that Tig no longer works for Doretta's snow plowing company.

{¶35} Brandon O'Neill also testified that the Scheffields were like family to him, mother and father figures, and that Doretta had been friends with his biological parents. He opined that their marriage was loving and that the two were inseparable. Brandon had picked up Gina from her house around 6:00 p.m. on December 27, 2011, and they went to Gina's friend's house for about fifteen minutes. Brandon and Gina then drove separately to the Sheffield residence; he picked up a pizza and arrived around 7:00 p.m. He was also working on machines and snowmobiles, using air ratchet tools and polishing chemicals. He stated nothing seemed unusual or suspicious that evening, but that normally Doretta and Randy both followed the weather news on snowy days. Brandon testified he does not remember calling 911 after Doretta discovered Randy's body but recognized his voice in a recording of that call. He left the property approximately 20-30 minutes later.

{¶36} Jason Tibbs testified that he was Tig's friend and used to work for Scheffield Lawns, but Randy helped him start up his own business. He called Tig at 6:00 p.m. on December 27, 2011, because he thought they would already be out plowing snow. Because they were not, Jason stopped over at the garage to smoke a joint of marijuana with them before plowing. Doretta told Jason that Randy was in the house sleeping, he was sick, and not to bother him or go inside. Jason felt this was odd because Randy would have wanted to be woken up for the first plow of the season. Jason testified Randy would watch the weather news on snowy days and religiously shovel his back walkway in order to determine how much snow had fallen. When he arrived at 6:00 p.m., that walkway had not been shoveled.

12

{¶37} Jason testified that when he and Tig ran into the bedroom, the blanket was pulled over Randy's head. He said that after the police and paramedics arrived, he was the only person who remained inside the house; Tig and Doretta stayed in the garage with Shawn, and Brandon was picked up by his father. Jason was told adamantly by Doretta not to call Randy's parents because they would just want to rush over to the house. He also testified that Doretta was upset the coroner was taking so long in the bedroom and that she spoke of remodeling the bedroom.

{¶38} Jason testified he replaced every door and lock in the house after Randy's death, but when he arrived three days after doing so, every door was unlocked. He also said that Randy rarely used his cell phone; when Jason needed to get a hold of Randy, he called Doretta's phone.

{¶39} Allison Dean testified for the prosecution; her boyfriend, Brad Davis, later testified for the defense. Allison testified that Brad worked for Scheffield Lawns, and they visited the Scheffields about once a month; they were also friends with Tig and Gina. The evening of December 27, 2011, at around 6:50 p.m., they stopped by the Scheffield house on their way to a party. Brad entered the house, came right back out, and then they both went into the garage; Tig, Shawn, and Doretta were there. Allison testified that Doretta was watching a snowmobile show and appeared antsy; she was smoking a lot, talking a lot, and pacing back and forth. When she saw Doretta a few months after Randy's death, Doretta told Allison she was worried they were going to end up in court. Allison stated that following Randy's death, Doretta owned the landscaping company with Beth Ann and Carl. Tig and Brad no longer worked for the company because they were unhappy with how Doretta, Beth Ann, and Carl were running it.

{¶40} Craig Schwartz, Tig's friend, testified that he arrived at the garage around 3:00 or 4:00 p.m. on December 27, 2011, to pick up his lawnmower. He left to pick up ramps for his truck and came back approximately fifteen minutes later; he stayed for another 30-45 minutes. Doretta was there and told him that Randy was sleeping and not feeling well. Craig testified that he is no longer in contact with Tig and Gina.

{¶41} Jessica Chalky, Craig's fiancé and Gina's friend, testified that she was supposed to meet up with Gina on December 27, 2011, but Gina never showed up. She stated that Doretta often said Sheffield Lawns was going to be Tig's company, but never in front of Randy. Jessica stated Gina would often get mad that Tig was not always compensated for work or timely given his W-2s. Jessica was at Randy's funeral; she testified Doretta's family and Randy's family were separated and did not interact. Jessica no longer speaks to Tig, Gina, or Doretta because "things didn't make sense."

{¶42} Rebecca Scheffield, Randy's mother, testified. She did the bookkeeping for Scheffield Lawns until Doretta married Randy and took over in 2003. Rebecca's address remained the business's address; she would open the mail, keep a record of the checks, make deposit slips, and notify Randy or Doretta when they were ready to deposit. Rebecca testified she opened mail from the Cuyahoga County Court around August 2011 and learned of a judgment filed against Sheffield Lawns. Rebecca called Doretta, who said she would take care of it and asked her not to tell Randy; she never did. Rebecca said she saw Doretta frequently but thought Doretta resented her and Eugene, Randy's father. Doretta helped them around the house and took them to doctor appointments. Doretta treated Randy well but often complained about him to Rebecca: Doretta felt Randy was lazy and controlling and that Tig knew how to handle

14

the business better than Randy. Rebecca testified Doretta would say these things in front of Sheffield Lawns employees.

{¶43} Rebecca testified the last time she saw Randy was December 17, 2011. The prosecution introduced a picture of Doretta allegedly taken that day. There are Christmas decorations in the background. The date-stamp on the picture indicates April 1, 2006, which Rebecca said is because she did not know how to change the date on her camera. Doretta told Rebecca she had just had her hair cut and colored that day; Rebecca testified it was odd that she would have been getting another haircut ten days later on December 27, 2011.

{¶44} Rebecca testified that she and Eugene were about to leave their house when Doretta let herself in through the garage at 9:15 a.m. on December 27, 2011. Doretta was there to pick up checks; Rebecca was not expecting her. Doretta only stayed fifteen minutes, did not talk much, and never took off her coat and hat. This was contrary to Doretta's recorded interview during which she stated Rebecca and Eugene were expecting her because they had gifts for her to pick up and that she had visited for about 45 minutes and watched a TV show with them. Rebecca stated she called Doretta's cell phone three times that day, but Doretta never answered or called back.

{¶45} Rebecca and Eugene were notified of Randy's death the next day by Tracy Jordan, a Victim Advocate with the Geauga County Sheriff's Office; Doretta never called them. They did not see each other or speak until the meeting at the funeral home on December 30, 2011. Doretta and her family did not speak to Randy's family at the funeral on January 2, 2012. When asked if she liked Doretta, Rebecca stated, "Why would I like her? She doesn't like me."

15

{¶46} Randy's sister, Melody Scheffield, testified that Scheffield Lawns no longer exists. The assets were passed over to Doretta's daughter, Beth Ann, and the company is now BCD Landscaping (for Beth Ann, Carl, and Doretta). Melody testified Doretta always called her immediately anytime Rebecca was sick or in the hospital; Doretta did not call her when Randy died. She also stated they did not speak at the funeral. A small event was held at the cemetery on January 11, 2012, for family and close friends. The only conversation Melody had with Doretta that day involved Doretta angrily asking where the checks were and accusing Rebecca of depositing them into the wrong account.

{¶47} John Blust, a special agent with the Ohio Bureau of Worker's Compensation ("BWC"), was also called to testify. Agent Blust had investigated Sheffield Lawns regarding checks submitted to Beth Ann on behalf of BWC, as the company had not been paying their state insurance premiums. He once showed up at the Sheffield residence unannounced; Doretta met him in the driveway and did not ask him inside to meet with Randy. Doretta also had not responded to letters requesting payroll information and had once hung up the phone on him. Agent Blust testified that Doretta and Beth Ann were the subjects of the investigation.

{¶48} The State called four of Randy's friends to testify. Mark Carney testified as to Randy's routine on snowy days, in particular that the weather news would be on all day at the house. He stated that Doretta did everything for Randy. He said Randy never checked his voicemail messages. Doretta never spent long periods of time in the garage, she would just stop in now and then for ten to twenty minutes at a time. Mark testified it was unusual for Randy to sleep for long periods of time; even at night, Randy would wake up every two to three hours for a cigarette. Mark said the Scheffields' dogs

16

were never quiet when people were around. Finally, Mark testified that he never spoke to Doretta again after Randy's death and that Randy's circle of friends became suspicious of the situation because there was no communication from Doretta regarding Randy's death and no invitation to the small ceremony at the cemetery. He said it had become clear to many that "things weren't right."

{¶49} Michael Geisweidt was a friend of Randy's and a former employee of Scheffield Lawns. He also testified that Randy and Doretta would watch the weather news all day on snowy days. Michael stopped by the house two to three days after Randy's funeral to visit Doretta and her family. Michael testified there was no remorse, no talk of finding the killer, and there was talk of remodeling the house. He no longer talks to the family because he is not comfortable with "how it went down."

{¶50} Ralph Dickerson was a friend of Randy's since they were around 13 years old. Ralph testified that Randy and Doretta's marriage seemed fine; he was also close with Doretta. He said Doretta did a lot for Randy. He also testified, however, that in November 2011 Doretta said to him that Randy was driving her nuts and she was going to kill him.

{¶51} Ralph owns Fairway View Lawns and subcontracted with Randy for snow plowing for 21 years. He stated that he did not receive a 1099 form for the past two or three years that Doretta had been in charge of the accounts. When he inquired of Doretta, she said the accountant was working on it. Doretta asked him not to tell Randy.

{¶52} Ralph testified he always spoke to Randy on snowy days so that they could decide when to go out and plow. Ralph also stated the Sheffields' dogs were loud when people showed up at the house. On December 27, 2011, the day Randy died, he

17

started calling around 10:00 to 10:30 a.m.; he did not leave voicemail messages because Randy did not know how to retrieve them. Randy did not answer and never called back. Finally, Ralph called Doretta, who told him that Randy was sick. The day after Randy's funeral, on January 3, 2012, Doretta threw herself a birthday party at the house; Ralph stopped by. He testified that all of Randy's "models and stuff" were gone; there were no pictures around; the house seemed "bare of everything." He said Gina was acting strange, and Doretta would not look him in the eyes. Ralph testified that he told people he thought Doretta was involved with Randy's death and that he received a cease and desist letter from Doretta's attorney. Ralph also testified that he had some altercations with Carl Majors after Randy's death as a result of his comments.

{¶53} Andrea Bailey testified. She was friends with Ralph, sometimes his girlfriend, and knew Randy and Doretta through Ralph. She testified that she and Ralph went to visit Doretta in February 2012, two months after Randy's death. Doretta talked a lot about what she had done to the house since Randy died. Doretta also told Andrea that the coroner indicated Randy did not have much time longer to live, anyhow.

{¶54} Eight expert witnesses testified on behalf of the prosecution. Ed Staley is a special agent with the crime scene unit and major crimes at BCI. Mr. Staley was present at the scene on December 27, 2011. He took extensive photos, both inside and outside the residence, diagrammed the main second floor of the home, and collected items for evidentiary analysis. Mr. Staley testified that he observed no signs of rummaging through the house or any disturbance with the entrances to the house. He testified that he did not go through the glove compartment of Randy's truck where it was later determined Doretta had placed $200 cash.

18

{¶55} Dr. Erica Armstrong is a forensic pathologist with the Cuyahoga County Medical Examiner's Office. She performed the autopsy on the morning of December 28, 2011. Dr. Armstrong testified that rigor mortis was already passing on Randy's body. She testified that based on the brain injuries Randy sustained, death occurred within minutes to a half hour. Dr. Armstrong also testified that there were food contents in Randy's stomach, indicating he had eaten within two hours prior to his death.

{¶56} Curtiss Jones is the supervisor of the Trace Evidence Department within the Medical Examiner's Office. He testified that he found gun powder on Randy's hair, which indicated the shooter was no more than three to four feet away from Randy. He also extensively tested Randy's stomach contents, portions of which he found to be consistent with a McDonald's hash brown. Mr. Jones also found preliminary indications of blood on the boots Doretta and Tig were wearing on December 27, 2011.

{¶57} Christine Scott is a forensic DNA analyst with the Medical Examiner's Office. She testified that she analyzed DNA from Randy's left hand fingernails, which was consistent with Doretta's DNA. Ms. Scott found no foreign DNA on the penile swabs taken from Randy.

{¶58} Jonathan Gardner is a forensic scientist in the Firearms Section of BCI. Mr. Gardner analyzed the bullet found in Randy's skull and a long rifle collected from the house. He testified that the bullet was not fired from that rifle. He also testified that the same type of ammunition can be used in a .22 caliber long rifle and a .22 caliber pistol.

{¶59} Martin Lewis, Jennifer Acurio, and Jennifer Colecchia are also forensic scientists with BCI. Mr. Lewis testified that he created the gunshot residue report. When testing for gunshot residue, he testified, three particles are looked for: lead,

19

barium, and antimony. These particles may be found when a person has discharged a firearm; some or all of them may also be found on someone who stood in close proximity to the discharge, who touched something with residue already on it, or who shook hands with the shooter. Positive results may also show up on someone who has handled some types of brake linings, some fireworks, or certain types of passenger side air bag primer. Mr. Lewis testified that gunshot residue is easy to get rid of by washing hands or clothes and that it will dissipate after four to six hours of regular activity. Also, if someone shot a gun at 9:00 a.m., it would most likely be gone by midnight. Mr. Lewis's tests indicated the seat belt and steering wheel of Randy's truck tested negative for gunshot residue. Doretta's tests were also negative.

{¶60} Jennifer Acurio tested the glass vial from the tin found in the bedside dresser drawer. She testified it tested positive for a trace amount of cocaine residue.

{¶61} Jennifer Colecchia cut and prepared samples for DNA analysis. She testified the stain on the hand towel from the bathroom was presumptive positive for blood, as was a swab from the inside of the bathroom drain trap.

{¶62} Brenda Gerardi is the DNA Laboratory Supervisor with BCI and performed the DNA analysis. She testified the razor blade in the tin where the cocaine residue was found contained only Doretta's DNA. Both Doretta's and Randy's DNA were found on the Ruger pistol box and the magazine that was inside the box. The tests from the hand towel and the drain trap indicated Doretta was a minor DNA contributor, and Randy was the major DNA contributor. Ms. Gerardi also testified that Randy's and Doretta's DNA were found on the bathroom door handles and the handle of the dresser drawer where the Ruger box was found; these items also had one other additional contributor, but that sample was inconclusive.

**Challenged Testimony**

**{¶63}** Doretta's fourth assignment of error on appeal relates to the testimony of Tracy Jordan, a Victim Advocate with the Geauga County Sheriff's Office. The assignment of error states:

**{¶64}** "Appellant was denied a fair trial by the admission of expert opinions in areas in which the witness Tracy Jordan was not permitted by law to testify and which amounted to credibility testimony."

**{¶65}** Doretta argues that Tracy Jordan improperly testified as to her "subsequent trauma behavior." Because Ms. Jordan was not qualified to provide an expert opinion on that issue, Doretta asserts her testimony amounted to no more than her judgment of Doretta's credibility.

**{¶66}** Evid.R. 701 governs opinion testimony by lay witnesses and provides as follows: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "Where the testimony is based on recited personal observations, a nonexpert can express opinions about" myriad topics, including "another's emotional state[.]" *State v. Morris*, 8 Ohio App.3d 12, 17 (8th Dist.1982) (citation omitted).

**{¶67}** Evid.R. 702 governs expert testimony and provides, in relevant part:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

21

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

{¶68} Tracy Jordan testified that she worked closely with Doretta as a Victim Advocate in the days and weeks following Randy's death. She arrived on the scene shortly after emergency personnel on the night of December 27, 2011. Ms. Jordan testified that Doretta appeared to be in crisis, rocking back and forth. Doretta told Ms. Jordan that she would tell Randy's parents in the morning about Randy's death, that they both have bad hearts and numerous health issues, and that this news might kill them. The next morning, Doretta told Ms. Jordan that she could not tell them and asked Ms. Jordan to go over to their house without her.

{¶69} Ms. Jordan testified that she was involved with the families through the funeral, as both families requested her to mediate them through the process. She said that Rebecca and Doretta saw each other for the first time at the planning meeting at the funeral home; they hugged each other and cried. When Rebecca asked Doretta what happened, Doretta responded with her timeline of activities on December 27, 2011. When Rebecca told Doretta she wanted to see Randy, Doretta told her she did not want to see Randy like that. Following the meeting, Ms. Jordan accompanied Doretta back to the house. Tig was installing new doors and locks. Doretta told somebody to go to Randy's truck because there was $200 inside the manual in the glove compartment; she told Ms. Jordan it was for a trip she and Randy had planned to take.

{¶70} The following testimony is now challenged on appeal:

22

Q: And when you arrived on scene, what, if anything, did you notice?

A: * * * The Coroner and law enforcement was asking Doretta questions. I was present. She was still rocking back and forth, but at least she was answering their questions. But she wasn't asking any questions.

* * *

Q: Did they [Rebecca and Eugene] appear to you to be in poor health?

A: No, not at all. * * * They were not in that poor of health as I was told.

* * *

Q: Was there anything unusual about how the way it [the funeral] was planned?

A: Every time there was a decision to be made, Doretta would look at Rebecca and get her approval. Actually, Rebecca planned the whole funeral. She got to pick out the urn, the books, the cards. It was almost like the whole funeral was planned by Rebecca, not Doretta.

Q: And did that strike you as unusual?

A: I thought it was unusual, yes.

Q: Why?

A: The wife is usually the one who makes the plans, who knows what her husband wants and plans the whole funeral, who doesn't look for approval from anybody.

Q: Have you attended a lot of these planning sessions?

A: I have, yes.

Q: Is that in your capacity as a victim advocate you attend those?

A: Yes.

* * *

Q: Before we get into that, you said you received [Doretta] in the driveway [following the funeral meeting]?

A: Yes.

Q: And she moved quickly into the house?

A: Yes.

Q: Did you notice any type of hesitation?

A: None.

Q: Pause?

A: No.

Q: How about her demeanor?

A: She was on a mission.

Q: Okay.

A: Going straight into the house, knew exactly where she was going, didn't hesitate, didn't stop, didn't pause, didn't show – wasn't crying, what I expected, the reason why people asked me to be there with her.

Q: Sure. And as you said, you do that pretty often?

A: Yes.

Q: And was this, her demeanor, Doretta Scheffield's demeanor as you described it, was it what you would normally would see when you helped somebody into the home the first time in the wake of a violent crime?

A: Absolutely not.

* * *

Q: You mentioned in your training that one of the things you do, and you have been trained to do, is provide grief counseling?

A: Yes.

Q: Did you provide grief counseling to Doretta Scheffield?

A: No.

Q: Why did you not?

A: I tried to, but she wasn't interested in it.

Q: What do you mean by that?

A: On the day that I was over there with all the guys in the house she, I tried to sit down with her and explain some grief and grieving, but she was too busy.

Q: And did she appear to you to be grieving?

A: In my opinion, no.

[Defense]: Objection to that, and ask that it be stricken, your Honor.

[Court]: Overruled. She is a grief counselor. Overruled.

{¶71} We first note that defense counsel objected to only one of these statements, thus subjecting the rest to plain error analysis. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶108. Nevertheless, we do not find that any of Ms. Jordan's statements were offered as an expert witness. Although Ms. Jordan's experience as a Victim Advocate informed her opinion, she also had personal firsthand knowledge of Doretta's behavior and demeanor following Randy's murder. As her opinions were formed on the basis of this personal firsthand knowledge, and not on information provided to her by others in preparation for trial, she was not required to be qualified as an expert witness. Accordingly, we hold that Ms. Jordan's opinion testimony as to whether Doretta was grieving her husband's death was admissible lay witness opinion testimony pursuant to Evid.R. 701.

{¶72} The fourth assignment of error is without merit.

{¶73} Doretta's third assignment of error relates to the testimony of Juanita Vettel, a detective with the Geauga County Sheriff's Office. Doretta asserts the trial

25

court improperly allowed Detective Vettel to offer opinion testimony regarding Doretta's veracity and guilt.  The assignment of error states:

{¶74}  "Appellant was denied a fair trial by the witness' improper comments while testifying."

{¶75}  "Opinion testimony from a police officer relating to an accused's veracity is not admissible.  A jury tends to trust a police officer's perceptions, similar to that of an expert witness.  As a result, such testimony infringes upon the fact-finding function of the jury and affects the fundamental fairness of the trial."  *State v. Brown*, 11th Dist. Lake No. 2014-L-037, 2016-Ohio-1358, ¶33 (internal citations omitted).  A witness may, however, provide "testimony in the form of opinions or inferences * * * which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  Evid.R. 701; *see also State v. Bowden*, 11th Dist. Ashtabula No. 2013-A-0040, 2014-Ohio-158, ¶44 (citation omitted).

{¶76}  "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence."  *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991).  "Where defense counsel fails to object at trial, the admission of testimony must constitute plain error, defined as error that is obvious and outcome-determinative, to justify reversing the judgment or conviction."  *Bowden*, *supra*, at ¶41, citing *Lang*, *supra*, at ¶108; Crim.R. 52(B) ("[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court").  As the reviewing court, we "must consider all the evidence at trial and determine whether the alleged error substantially affected the outcome of the trial and influenced the jury to

26

enter a verdict that it would not have otherwise entered if the error had not occurred." *State v. Davie*, 11th Dist. Trumbull No. 92-T-4693, 1995 WL 870019, *11 (Dec. 27, 1995), citing *State v. Slagle*, 65 Ohio St.3d 597, 605 (1992).

{¶77} Doretta identifies multiple times she believes Detective Vetter improperly testified and thereby usurped the jury's role as fact-finder. Doretta argues she was prejudiced by such testimony and that her convictions should be reversed.

{¶78} First, defense counsel's objections to one of the statements was sustained by the trial court; thus, there is no error of which Doretta can now contest. Also, certain statements of which Doretta now complains were not statements of opinion regarding Doretta's veracity but are merely statements of fact or explanation; one of the statements was actually stipulated to by defense counsel.

{¶79} Detective Vetter did state she thought some things were "odd" or "interesting." These were not comments on Doretta's truthfulness. Rather, Detective Vetter was noting that she followed up on certain things during her investigation because they did not conform with what Doretta had described to her as the couple's usual routine (e.g., that they did everything together). Much of the challenged testimony was not objected to and simply does not rise to the level of plain error.

{¶80} We do take issue with the leading line of questioning used by the prosecutor on redirect examination:

Q: That was her life, right?

A: That was her life.

Q: Could become pretty resentful of having to clean up people's goggles and put on their boots, right?

A: I would think.

27

Q: Kind of resentful that you are not going on these trips and doing things that maybe you want to do, correct?

A: Correct.

Q: Resentful that you're the one that has to cook all the meals and take care of him, correct?

A: Correct. I would think.

{¶81} Although this is not an attempt to elicit Detective Vetter's opinion regarding Doretta's veracity, it is a blatant and improper attempt to establish a motive through opinion testimony about Doretta's state of mind. Defense counsel did not raise an objection to these questions. We do not find it affected the outcome of the trial such that it rises to the level of plain error, however, in light of all the other testimony presented at trial. Other witnesses testified to Doretta's feelings of resentment towards Randy's helplessness and that she did everything for him, including tying his boots, refilling every cup of coffee, and cooking all of his meals. Doretta even indicated in her recorded interview that she did everything for Randy: for example, she would take care of and pick up after Randy and his friends when they went on snowmobile and camping trips. In light of all the evidence presented at trial, it has not been established that this line of questioning substantially affected the outcome of the trial and influenced the jury to enter a verdict it would not have otherwise entered.

{¶82} Appellant's third assignment of error is without merit.

**Ineffective Assistance of Counsel**

{¶83} Following oral argument, this court permitted Doretta to file a supplemental assignment of error, which states:

> Appellant Doretta Scheffield was denied effective assistance of counsel as guaranteed by Section 10, Article 1, of the Ohio Constitution and the Sixth and Fourteenth Amendments of the U.S. Constitution because trial counsel failed to object to inadmissible

28

opinion testimony from the detective and from the lay witness grief counselor.

{¶84} Doretta argues she received ineffective assistance of counsel because her trial counsel failed to object to the above-challenged testimony of Detective Vetter and Tracy Jordan.

{¶85} In order to prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that trial counsel's performance fell "below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus (adopting the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)). There is a general presumption that trial counsel's conduct is within the broad range of professional assistance, *id.* at 142, and debatable trial tactics do not generally constitute deficient performance. *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995) (citation omitted). In order to show prejudice, the appellant must demonstrate a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Bradley*, *supra*, at paragraph three of the syllabus.

{¶86} We have determined there was no plain error in the trial court admitting the testimony Doretta now challenges on appeal because it did not substantially affect the outcome of the trial. As a result, we cannot say Doretta suffered any prejudice by her trial counsel's failure to object. Doretta has not established a reasonable probability that the result of the proceeding would have been different had trial counsel objected.

{¶87} Doretta's supplemental assignment of error is without merit.

## The Defense

{¶88} Following the prosecution's case-in-chief, the trial court granted the State's motion to dismiss the remaining complicity counts, Counts 1, 3, 5, and 7. The

trial court also granted defense counsel's Crim.R. 29 motion for acquittal as to Count 8, aggravated theft. The defense therefore presented evidence, witnesses, and testimony only on Counts 2, 4, and 6: aggravated murder, murder, and tampering with evidence.

{¶89} Brad Davis was the first to testify; his girlfriend, Allison Dean, had previously testified on behalf of the prosecution. Brad testified he was a close friend of Tig and worked for Scheffield Lawns. Brad had some issues with not receiving W-2s from the company but also received help from the Scheffields, including loans. He testified that the Scheffield house was rarely locked; friends and family were free to walk in any time. He felt that Doretta and Randy had a good relationship. Brad was at the Scheffield house on Christmas for an open house party; he said nothing unusual happened that day. Two days later, on December 27, 2011, he and Allison stopped by; the house was dark, which he testified was not unusual, so they went out to the garage. They stayed approximately 30-40 minutes, and he did not think Doretta acted odd while they were there. He testified that he felt comfortable at 7:00 p.m. that it was not yet time to plow that evening because there was not a lot of snow accumulation.

{¶90} Brad further testified that he and his brother changed the doors and locks at Doretta's house, not Jason Tibbs. He recalls that following Randy's death, Doretta slept mostly on the couch in the living room and that the doors are now locked if no one is around. He testified that he had never seen Doretta with Randy's gun, and Randy did not keep it in plain view.

{¶91} Cindy Forstag testified that she knew Doretta as a customer at Charter One Bank. Cindy waited on Doretta on December 27, 2011, and recalled that Doretta seemed fine that day.

30

**{¶92}** Byron Wolfram worked for Scheffield Lawns in the past and had become friends with Tig. He testified that the Scheffields had an open-door policy, and he considered them to be an "auxiliary" family. Byron stated Randy and Doretta did everything together and had a good relationship. Byron arrived at the Scheffield house at 11:24 a.m. on December 27, 2011, but nobody was home. He called Tig, who was still at his house waiting for Shawn to pick him up for breakfast. Byron left and did not meet up with Tig that day. Byron testified that while he was there, the dogs did not come outside or bark. He testified that he went to Randy's funeral; Doretta was crying. He stated Doretta no longer felt comfortable living at the house.

**{¶93}** Brenda Brown, who lived down the street from the Scheffields, testified that her son was friends with Tig and Randy, but she had never met Doretta. She testified that she had seen "the red shirt man" walking towards the Scheffield residence around 11:00-11:15 a.m. on December 27, 2011, and then towards the Brown residence approximately 20-40 minutes later. She was contacted by the police four days later and gave a statement. She identified the man in the picture from video surveillance at the Marathon station and testified that the station was within walking distance from her house and the Sheffield house. Finally, Brenda testified that Doretta appeared very distraught at Randy's funeral but admitted she had never seen her before.

**{¶94}** The defense called Dr. Werner Spitz to the stand, who was qualified as an expert witness. Dr. Spitz detailed his lengthy career as a medical examiner, coroner, professor of forensic pathology, and author; specifically, he has written texts on gunshots that are studied by students of the field. He explained that "lividity," or "livor mortis," is the settling of blood in the body after a person dies; it becomes fixed after six

31

to eight hours, meaning the skin does not change color with pressure. He then explained that "rigor mortis" occurs when the joints become stiff over time, approximately 10-12 hours, and that the stiffness then starts to dissipate. Dr. Spitz testified that temperature affects the rigor mortis process, thus the fact that Randy was under the covers on a bed that was above a heat register would have sped up the process of rigor mortis setting in and dissipating. Dr. Spitz testified that he sees some lividity in the photos taken at the crime scene, but not much. He stated the pictures taken right before the autopsy was performed the following morning indicate lividity had become fixed at that point and that the body has passed out of the rigor state. Dr. Spitz further testified that the digestive process does not stop at death—rather, it continues until all of the stomach contents have decomposed. Based on the contents of Randy's stomach at the time of the autopsy, Dr. Spitz does not believe they could be from a McDonald's hashbrown eaten at 7:30 a.m.; that meal would have been more decomposed. He agrees the content is a potato substance, but that Randy had to have eaten another meal before he died. All of these observations led Dr. Spitz to estimate the time of death as 2:00 p.m.

{¶95} The prosecution recalled Dr. Erica Armstrong, who performed Randy's autopsy, as a rebuttal witness to go over Dr. Spitz's report. Dr. Armstrong clarified what led her to the conclusion that Randy died the morning of December 27, 2011. Based on her observations of livor mortis, she estimated the time of death between 9:30 a.m. to 1:00 p.m. Based on her observations of rigor mortis, she estimated the time of death between 9:30 a.m. to 3:00 p.m. Dr. Armstrong stated that stomach contents are a better gauge of the actual time of death because digestion does not continue after death; all brain function has ceased and is no longer communicating with the stomach.

32

Based on her observations of Randy's stomach contents and her knowledge that he had a meal around 7:30 a.m., she narrowed the time of death to sometime between 8:30 and 9:30 a.m. Dr. Armstrong then identified portions of Dr. Spitz's testimony that either misquoted or misinterpreted her autopsy report. Finally, she pointed out that Dr. Spitz's report states Randy was last seen alive at 2:00 p.m., but that there was no testimony, evidence, or other reason supporting that statement.

{¶96} The defense rested. The trial court denied the defense's renewed Crim.R. 29 motion for acquittal.

{¶97} On September 29, 2015, the jury returned a verdict of guilty on aggravated murder, murder, and tampering with evidence. The trial court subsequently denied Doretta's motion to set aside the verdict and enter a judgment of acquittal.

## Sufficiency and Manifest Weight

{¶98} Doretta's first and second assignments of error state:

> [1.] The State failed to present sufficient evidence to sustain a conviction against Appellant.

> [2.] Appellant's convictions are against the manifest weight of the evidence.

{¶99} When reviewing whether sufficient evidence was presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307 (1979). Thus, a claim of insufficient evidence invokes a question of due process, the resolution of which does not allow for a weighing of the evidence. *State v. Habo*, 11th Dist. Portage No. 2012-P-0056, 2013-Ohio-2142, ¶14 (citation omitted).

33

{¶100} To determine whether a verdict is against the manifest weight of the evidence, a reviewing court must consider the weight of the evidence, including the credibility of the witnesses and all reasonable inferences, to determine whether the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A judgment of a trial court should be reversed as being against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, *supra*, at 387, quoting *Martin*, *supra*, at 175.

{¶101} Doretta was convicted of aggravated murder, an unclassified felony, in violation of R.C. 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another * * *." Doretta was also convicted of tampering with evidence, pursuant to R.C. 2921.12(A), which provides: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely instituted, shall * * * (1) [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" Although Doretta was additionally found guilty of murder, it merged into the aggravated murder conviction as an allied offense, thus we do not address it here.

{¶102} The State presented evidence upon which a juror could rationally conclude that Doretta murdered her husband with prior calculation and design and that she had the means, motive, and opportunity to do so at the time of death estimated by the prosecution's expert witness. The State's theory of the case at trial was that Doretta intentionally shot and killed Randy with his own Ruger pistol before she left the house,

34

between 9:00 and 9:30 a.m., on December 27, 2011. The State presented evidence that the approximate time of death was between 8:30 and 9:30 a.m., at which time Doretta was admittedly the only other person at the house. This conclusion was reached by analyzing the stomach contents of the deceased, as well as livor and rigor mortisis at the time Randy's body was discovered; this was all presented to the jury by expert witness testimony. It was also shown that Randy was shot while he was sleeping. The State argued that if an unknown intruder had entered the house, the dogs would have barked and woken up Randy prior to anyone being able to shoot him. The tampering charge was based upon the State's theory that, because the Ruger pistol was missing and never found, Doretta must have disposed of it after using it to murder Randy.

{¶103} The defense presented a different theory of the case, namely that Randy died at a later time while Doretta was not at home. Doretta's timeline of her activities during the day of December 27, 2011, was in large part corroborated by video surveillance, phone records, and receipts. Evidence was presented, however, that could support an inference that those actions were taken in order to create an alibi for the murder. The jury clearly accepted the State's version of events, which we conclude was supported by sufficient and plausible evidence.

{¶104} There is also nothing in the record to indicate the jury lost its way in weighing the evidence. The jurors had the opportunity to observe the witnesses presented by both sides and to judge their credibility. The jurors also watched the recorded video of Doretta's first interview with Detective Vetter and thus were able to perceive Doretta's credibility and veracity firsthand. The jury deliberated for nearly five days before rendering its verdict and, in that time, asked many questions of the court.

35

We therefore find the jury's conclusion that Doretta is guilty, beyond a reasonable doubt, of murdering Randy with prior calculation and design and disposing of the firearm is not against the manifest weight of the evidence.

{¶105} The first and second assignments of error are without merit.

<u>**Self-Incrimination**</u>

{¶106} The matter came on for sentencing on November 4, 2015. The trial court merged Counts 2 and 4 as allied offenses, and the State elected to proceed to sentencing on Count 2. The trial court sentenced Doretta to consecutive sentences: a prison term of life with the possibility of parole after 25 years on Count 2 (aggravated murder), and a prison term of 30 months on Count 6 (tampering with evidence).

{¶107} Doretta's fifth assignment of error states:

{¶108} "Appellant's rights against self-incrimination were violated when the trial court imposed a harsher sentence after it found that Appellant had no remorse."

{¶109} Doretta claims the trial court imposed a longer prison sentence because she did not acknowledge her guilt or express remorse at the sentencing hearing. Doretta asserts that if she had expressed remorse at the sentencing hearing, she would have had to give up her constitutional right against self-incrimination.

{¶110} We review constitutional challenges de novo. *State v. Henderson*, 11th Dist. Portage No. 2010-P-0046, 2012-Ohio-1268, ¶10, citing *State v. Perry*, 8th Dist. Cuyahoga No. 89819, 2008-Ohio-2368, ¶22.

{¶111} The Fifth Amendment to the United States Constitution provides for a right against self-incrimination and is made applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). Article I, Section 10, of the Ohio Constitution provides nearly identical language: "No person shall be compelled in any

36

criminal case to be a witness against himself * * *." This constitutional right continues into the sentencing phase of a case against a defendant. Thus, a sentencing court cannot use a defendant's silence at sentencing against her when imposing a sentence. *State v. Betts*, 8th Dist. Cuyahoga No. 88607, 2007-Ohio-5533, ¶89, citing *Mitchell v. United States*, 526 U.S. 314, 322 (1999).

{¶112} Pursuant to R.C. 2929.12(D)(5), however, "lack of remorse" is a sentencing factor an Ohio trial court is required to consider when fashioning an appropriate sentence. "Thus, even where a defendant does not speak at sentencing, the court's statement that the defendant demonstrated a lack of remorse and an unwillingness to take responsibility, does not demonstrate that a court's sentencing decision is based upon the silence but shows only that the court was considering the statutory sentencing factors." *State v. Hodges*, 8th Dist. Cuyahoga No. 101145, 2014-Ohio-4690, ¶11, citing *State v. Clunen*, 7th Dist. Columbiana No. 12 CO 30, 2013-Ohio-5525, ¶21 and *State v. Moore*, 11th Dist. Geauga No. 2011-G-3027, 2012-Ohio-3885, ¶47.

{¶113} Doretta did not give an allocution at her sentencing hearing; her attorney spoke on her behalf, stating Doretta continues to profess her innocence. The trial court made the following observation: "Obviously, given the stance of the Defendant that there is no guilt acknowledged in this case, there is no showing of remorse, so that the Court recognizes that there is no remorse shown when it comes to sentencing." This statement indicates the trial court was addressing the statutory sentencing factor on the record while recognizing the reason Doretta did not show remorse. There is no indication the trial court's imposition of sentence was based on Doretta's decision not to allocute and accept guilt but, rather, that Doretta's lack of remorse was based on her

37

continued claim of innocence.  Doretta has not made a showing that the trial court violated her Fifth Amendment right against self-incrimination.

{¶114} The fifth assignment of error is without merit.

{¶115} The judgment of the Geauga County Court of Common Pleas, convicting Doretta Scheffield of aggravated murder and tampering with evidence, is hereby affirmed.

CYNTHIA WESTCOTT RICE, P.J.,

COLLEEN MARY O'TOOLE, J.,

concur.